DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from four judgments of the Lucas County Court of Common Pleas, in a case brought by appellees, MidAm Bank ("MidAm") and Key Bank National Association ("Key Bank"), to collect funds lost through a check kite carried out by Shale Dolin, deceased. On appeal appellant, Sue Anne Dolin, individually and as executrix of the estate of Shale Dolin,[1] sets forth the following eight assignments of error:
 {¶ 2} "ASSIGNMENT OF ERROR NO. 1 — THE TRIAL COURT ERRED IN CONSTRUING MRS. DOLIN'S GUARANTIES TO COVER THE OVERDRAFT WHICH OCCURRED AS A RESULT OF THE CHECK KITING.
 {¶ 3} "ASSIGNMENT OF ERROR NO. 2 — THE TRIAL COURT ERRED IN DENYING MRS. DOLIN'S MOTION FOR SUMMARY JUDGMENT BASED UPON THE CONTRACTUAL DEFENSES ASSERTED BY MRS. DOLIN.
{¶ 4} "1. THERE WAS NO MEETING OF THE MINDS OF THE PARTIES WITH RESPECT TO THE GUARANTIES BEYOND THE LINES OF CREDIT.
{¶ 5} "2. THE GUARANTIES ARE NOT ENFORCEABLE AS TO THE OVERDRAFTS BECAUSE OF A LACK OF CONSIDERATION.
{¶ 6} "3. ENFORCEMENT OF THE GUARANTY OF THE OVERDRAFT IN EXCESS OF THE AMOUNTS OWED ON THE LOANS WOULD BE UNCONSCIONABLE.
{¶ 7} "4. THE BANKS' GROSS NEGLIGENCE ESTOPS THEM FROM ENFORCING THE GUARANTIES.
{¶ 8} "5. BECAUSE OVERDRAFTS CAUSED BY CHECK KITING OF NEARLY $2 MILLION ARE NOT REASONABLE EXTENSIONS OF CREDIT, THE GUARANTIES CANNOT BE ENFORCED AS CONTINUING GUARANTIES.
{¶ 9} "6. THE MIDAM GUARANTY TERMINATED ON JUNE 4, 1999, WHEN MRS. DOLIN DID NOT SIGN A LOAN EXTENSION AND/OR MODIFICATION AGREEMENT.
{¶ 10} "ASSIGNMENT OF ERROR NO. 3 — THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE BANKS DID NOT MITIGATE THEIR DAMAGES.
{¶ 11} "ASSIGNMENT OF ERROR NO. 4 — THE TRIAL COURT ERRED IN FAILING TO FIND THAT NO AMOUNT COULD BE RECOVERED ON MRS. DOLIN'S GUARANTY OF KEYBANK'S NOTE BECAUSE A NOVATION OCCURRED.
{¶ 12} "ASSIGNMENT OF ERROR NO. 5 — THE TRIAL COURT ERRED IN STRIKING MRS. DOLIN'S JURY DEMAND.
{¶ 13} "ASSIGNMENT OF ERROR NO. 6 — THE TRIAL COURT ERRED IN FAILING TO CREDIT MRS. DOLIN FOR THE SUM OF $811,330.00 RECEIVED BY KEYBANK FROM INSURANCE PROCEEDS COVERING LOSSES DUE TO CHECK KITING.
{¶ 14} "ASSIGNMENT OF ERROR NO. 7 — THE JUDGMENT SHOULD NOT HAVE INCLUDED INTEREST AFTER NOVEMBER 9, 2000, THE DATE THAT SHALE'S FILED ITS BANKRUPTCY PETITION; OR, ALTERNATIVELY, ANY AWARD OF INTEREST MUST BE REDUCED BY INTEREST WHICH THE BANK ACCRUED ON MONEY THAT IT RECOVERED BUT DID NOT APPLY TO THE DEBT.
{¶ 15} "ASSIGNMENT OF ERROR NO. 8 — THE TRIAL COURT ERRED IN FAILING TO GRANT JUDGMENT ON MRS. DOLIN'S CLAIM AGAINST THE BANKS FOR GROSS NEGLIGENCE."
 {¶ 16} At all times relevant to this appeal, Shale's Talmadge Pharmacy, Inc. ("Shale's") was an Ohio corporation, which operated as many as five pharmacies in the Toledo area. Shale Dolin, a pharmacist, was the owner and sole shareholder of Shale's. Appellant was Shale Dolin's wife. For purposes of clarity, the undisputed facts are set forth separately as to MidAm Bank and Key Bank, followed by the legal proceedings and issues presented on appeal.
 MIDAM BANK {¶ 17} On March 29, 1996, appellant and Shale Dolin borrowed $865,000 from MidAm Bank for construction of a strip-style shopping center in Perrysburg, Ohio. One of the scheduled tenants for the Perrysburg shopping center was Shale's pharmacy. The loan was secured with a mortgage on the shopping center and a second mortgage on the couple's home in Sylvania, Ohio.
 {¶ 18} On November 19, 1996, Shale's opened a deposit account and a disbursement account at MidAm Bank. The two accounts were tied together by an automated funds service agreement, which "swept" funds from the deposit account into the disbursement account to cover business checks written by Shale's.
 {¶ 19} On December 4, 1996, MidAm Bank extended credit to Shale's in the form of a variable rate commercial revolving loan, with a borrowing limit of $135,000. The loan provided overdraft protection by funding the disbursement account if the balance went below zero. To obtain the loan, Shale Dolin and appellant executed a promissory note, along with an open-end mortgage and an unlimited commercial guaranty.
 {¶ 20} On February 28, 1997, the Dolins borrowed an additional $75,000 to complete construction of the Perrysburg shopping center, secured by another mortgage on the shopping center property. On December 29, 1997, and on June 16, 1999, Shale Dolin executed extensions of the $135,000 revolving loan. On July 19, 1999, MidAm Bank renewed all of Shale's outstanding loans, a total amount of $997,547, for an additional 12 months. The loan approval memorandum listed Shale Dolin and appellant as guarantors.
 KEY BANK {¶ 21} Along with maintaining a deposit and disbursement account at MidAm Bank, Shale's also opened a commercial checking account at Key Bank. Shale Dolin and appellant were both authorized to write checks on the Key Bank account.
 {¶ 22} On August 21, 1996, Shale Dolin obtained a $100,000 variable rate, commercial revolving loan from Key Bank, secured by a promissory note. The same day, Shale Dolin and appellant co-signed a continuing,unlimited commercial guaranty in favor of Key Bank. On January 24, 1999, Shale Dolin entered into an agreement with Key Bank to refinance the revolving loan in the amount of $99,888.74.
 DISCOVERY OF CHECK KITING {¶ 23} During the week of September 11, 2000, MidAm personnel noticed a large negative balance in Shale's deposit account. Upon further investigation, it was discovered Shale's had been drawing corporate checks, in large sums, on uncollected deposits in its Key Bank account,
and presenting them for payment at MidAm, for the past 18 months. At the same time, Shale's had written other checks in large sums on uncollecteddeposits at MidAm and presented them for payment at Key Bank. Officials at MidAm and Key Bank identified the pattern of ongoing activity in the Shale's accounts as the practice of "check kiting." By the time the check kite was confirmed and the final checks were dishonored, overdrafts at both banks totaled more than $1 million.
 {¶ 24} Upon discovery of the overdrafts, the banks contacted Shale Dolin regarding the check kite. Several days later, Shale Dolin committed suicide.
 LEGAL PROCEEDINGS {¶ 25} On September 29, 2000, MidAm filed a complaint against appellant, individually, in which it sought cognovit judgment in the amount of $1,159,964.85, plus interest, pursuant to the terms of the MidAm promissory note and unlimited guaranty.[2] Appellant filed an answer asserting defenses of waiver, estoppel and laches, failure to mitigate damages, no meeting of the minds as to the effect of the guaranty, unconscionability, and failure of consideration.[3] Appellant asserted MidAm's gross negligence as an affirmative defense and counterclaimed for damages, claiming MidAm failed to discover the check kite in a timely fashion. Appellant also asked the trial court to declare the guaranty and mortgage void and unenforceable, and to order MidAm to pay her the "entire amount of the check kite," plus costs and attorney fees.[4] The counterclaim included a demand for a jury trial "on all issues triable by jury herein."
 {¶ 26} On January 31, 2001, Key Bank filed a complaint against appellant for judgment in the amount of $914,732, plus interest. On April 2, 2001, appellant filed an answer and counterclaim, which raised essentially the same defenses and claims asserted previously against MidAm. Both the answer and counterclaim contained a jury demand. Key Bank filed an answer and a motion to dismiss the counterclaim.
 {¶ 27} On March 5, 2001, MidAm filed a motion to strike appellant's jury demand, asserting the right to a jury trial was waived pursuant to the terms of the December 4, 1996, guaranty. The same day, MidAm asked the trial court for leave to file a motion for partial summary judgment and a memorandum in support, both of which were granted. In its motion, MidAm asked the trial court to: 1) hold appellant liable for all the outstanding indebtedness of Shale's pursuant to the guaranty and open-end mortgage signed on December 4, 1996; and 2) dismiss appellant's affirmative defense and counterclaims against the bank.
 {¶ 28} On March 19, 2001, appellant filed a memorandum in opposition to MidAm's motion to strike the jury demand. Appellant argued Civ.R. 39 prohibits parties to a lawsuit from contractually waiving the right to a jury trial.
 {¶ 29} On May 30, 2001, appellant filed a memorandum in opposition to partial summary judgment and a cross-motion for summary judgment. In support, appellant asserted her guarantor's liability was limited to $135,000, the amount of the revolving loan, which provided overdraft protection on Shale's checking account. Appellant also asserted the terms of the unlimited guaranty were ambiguous, unconscionable, unsupported by adequate consideration and constituted "unreasonable extensions of credit." Appellant further asserted MidAm cannot recover under the unlimited guaranty because MidAm employees failed to timely discover the check kite.
 {¶ 30} In support of her counterclaims, appellant argued MidAm was grossly negligent in not discovering the check kite in time to lessen the impact of the overdrafts. Appellant also argued that MidAm is liable for conversion because it paid the checks without verifying that Shale's account contained sufficient funds. Finally, appellant argued the guaranty and the $135,000 mortgage are "void" because MidAm received more than $135,000 in proceeds from the liquidation of Shale's. On June 27, 2001, MidAm filed a memorandum in which it addressed each of appellant's defenses and counterclaims. Appellant filed a reply on July 10, 2001.
 {¶ 31} On August 28, 2001, the trial court filed a judgment entry in which it found the parties were not prohibited from contractually waiving the right to a jury trial. Accordingly, the trial court granted MidAm's motion to strike appellant's jury demand. The same day, the trial court filed a separate judgment entry in which it addressed the parties' summary judgment motions. The trial court found the language of MidAm's unlimited guaranty is unambiguous, and applies to "overdrafts" that arise as a result of check kiting activities; however, questions of fact remained as to whether MidAm could have prevented or minimized the impact of the check kite by taking "reasonable affirmative action." The trial court further found the unlimited guaranty was not unconscionable, and appellant received consideration, in the form of the $135,000 revolving loan, for signing the unlimited guaranty. The trial court found no evidence the overdrafts resulted from MidAm's failure to transfer funds from the deposit account into the disbursement account, and determined a genuine issue of fact remained as to whether MidAm's failure to discover the kite before September 2000 was due to the bank's gross negligence.
 {¶ 32} Ultimately, partial summary judgment was granted to MidAm on the issue of enforceability of the guaranty, yet the court refused to strike appellant's defense of failure to mitigate damages. The trial court denied partial summary judgment to both parties as to appellant's counterclaim of gross negligence, and dismissed all of appellant's remaining defenses and counterclaims.
 {¶ 33} On February 2, 2002, Key Bank filed a motion to consolidate the MidAm and Key Bank cases, arguing the operative facts and applicable law were common to both cases; therefore, consolidation was in the interest of judicial economy. Key Bank stated "[a]s of August 3, 2001, Key Bank purchased MidAm's claim, and now stands in MidAm's shoes with respect to the MidAm suit. * * *" On February 19, 2002, appellant filed a second motion for summary judgment, seeking dismissal of MidAm's claims pursuant to the settlement agreement between MidAm and Key Bank. The motion was denied on May 20, 2002.
 {¶ 34} On May 21, 2002, the trial court ordered the two cases consolidated. Subsequently, the banks filed amended complaints in the consolidated action, along with a renewed motion for partial summary judgment, which appellant opposed. The parties later stipulated the trial court's rulings in the MidAm case applied equally in the Key Bank case. Accordingly, the renewed motion for partial summary judgment was denied.
 {¶ 35} On January 27, 2003, a bench trial commenced on the remaining issues of appellant's liability under the guaranty; the banks' failure to mitigate damages; and appellant's counterclaim of gross negligence. Testimony was presented on behalf of appellant and the banks.
 {¶ 36} At trial, testimony was presented by Dennis D'Ambrosio, Key Bank's National Manager for Deposit Services. D'Ambrosio described a check kite as a progressive increase over time in the number and amount of checks, which are often written in sequential order. Usually, more than one account is involved, to take advantage of the "float time" between reconciliation of the two accounts. D'Ambrosio stated, as a result of the Shale's check kite, the banks lost over $1 million.
 {¶ 37} As to the nature of the kite, D'Ambrosio testified accounts with less than a two-day turnover rate of deposits to funds are suspect. The turnover rate in Shale's account during May 2000 was .04 days. He stated someone looking at Shale's account during the summer of 2000 would have seen a pattern of large deposits and checks written in similar large amounts. He further stated the account had negative balances of $706,694 in March 2000, and $903,461.11 in August 2000.
 {¶ 38} MidAm Loan Officer Jeffrey Canfield testified he met with appellant and Shale Dolin in 1996 in regard to financing the Perrysburg strip shopping center. Canfield testified that in 1996, Shale's had five stores, with $6,600,000 in gross sales. Canfield stated he gave Shale's the $135,000 revolving loan based only on information obtained from Shale Dolin and the loan approval documents generated by the banks. He did not review the history of Shale's bank account activity.
 {¶ 39} MidAm Executive Vice President Michael Williams testified the "sweep" feature included in Shale's accounts helped delay discovery of the check kite, since the negative balances were not readily apparent. He stated the sweep account moved money into the disbursement account automatically, so it would have looked "normal."
 {¶ 40} On cross-examination, Williams testified the kite was found through a review of negative account balances. His trial testimony was based on reviewing a report of the Shale's accounts, which was not produced until after the kite was discovered. Williams further stated the kite report is not printed every day. Williams testified it takes at least two financial institutions to conduct a check kite, with one or both allowing the withdrawal of uncollected funds. He further testified, although it was "feasible" to do in-depth reviews of daily check kite reports, such reviews were not conducted by the bank prior to September 2000.
 {¶ 41} MidAm Senior Vice President Philip Clinard testified the total deposits into the Shale's account were "large" compared with its gross business receipts. On cross-examination, Clinard stated he did not expect tellers to know the size of a particular customer's business. He further testified the bank's training manual instructs bank employees to "know your customer." Clinard stated the check kite was not discovered as part of a standard review, but was uncovered when someone "stumbled on it."
 {¶ 42} MidAm Security Officer Gregory Snyder testified the bank's head teller and operations manager should look at the check kite report on a daily basis. He further testified a hold was put on the Shale's accounts on September 15, 2000, and the sweep feature was removed on September 25, 2000. Snyder stated the account had a negative balance of $310,000 in 1999, and it incurred services charges of over $70,000 in 2000, due to overdrafts.
 {¶ 43} Karen Cofod Smith, Executive Vice President of BankDetect, a computer software company, testified on appellant's behalf. After the trial court acknowledged Smith as an expert witness, she testified the parameters of the check kite report could have been adjusted to create a "workable volume" of reports. Smith further testified evidence of the Shale's check kite was "present in the statements" and the banks could have and should have detected it earlier. Smith stated, in her opinion: "If they [the banks] had taken the slightest bit of care in doing something consistently, that I think it [the kite] would have been captured earlier, the loss would have been reduced."
 {¶ 44} On cross-examination, Smith testified the banks' policies and procedures regarding check kiting were "adequate", and she could not name a specific date by which the check kite should have been detected. Smith further stated she has never done an in-depth fraud analysis as a banker. She defined "gross negligence" as "taking minimal assertive action to uncover the kite." When asked why the kite was not detected sooner, Smith could not "say either way that somebody did something on a daily basis or not," but assumed "someone or something" failed because the kite went on for such a long time.
 {¶ 45} Smith admitted she has no personal banking experience, and she stated she judges the effectiveness of her company's fraud-detection software programs based on the input of her customers in the banking industry. Smith did not have an opinion as to which bank employee should have found the kite or what should have been done at an earlier time.
 {¶ 46} Julie Meiers, a BankDetect employee, also testified on appellant's behalf at trial. Meiers stated, as a former MidAm operations manager, she read daily check kite reports. Meiers testified she left MidAm in April 1999, and she never saw Shale's name appear on a check kite report. Meiers testified the check kiting suspect reports are generated at the branch where an account was opened, not where a customer's banking activity takes place.
 {¶ 47} Richard Haug, CPA, testified as to common banking practices regarding fraud detection, based on his own experience as an accountant and a former bank auditor. Haug stated, in his professional opinion, "the policies and procedures at both banks were consistent with commercial banking practices. I've seen it at many banks, and they would be adequate to protect the bank in the kiting environment." Haug further stated check kiting, in general, is not a "major exposure of risk" in the banking industry. Haug said he did not value Smith's opinion as to the performance of the banks' employees, because Smith had no actual banking experience.
 {¶ 48} Richard Johnson, a forensic accountant, testified the check kite began in January 1999 and ended with Shale Dolin's death. Johnson also testified an earlier check kite had occurred, which ended in 1998 when Shale Dolin sold three of his pharmacies.
 {¶ 49} As to appellant's and Shale's assets, Johnson testified appellant had a separate account under the name "Sammsin, LLC," which she treated as a personal bank account, and another personal account containing $7,200 at MidAm. He stated Shale's made approximately $15,000 in payments for appellant's Cadillac, and also paid for appellant's and Shale Dolin's life insurance policies. Johnson testified he was not able to trace $1.8 million of the money lost in the check kite.
 {¶ 50} On cross-examination, Johnson testified, in his opinion, kited funds were mixed with "legitimate funds" from Shale's. He stated he never saw a Shale's check signed by appellant; however, he believed appellant made out some of the checks, which were signed by someone else. He further stated Shale's had a separate account at Exchange Bank, funded with gross business receipts, which was used to make at least $12,000 in payments for the Perrysburg shopping center, which was owned personally by appellant and Shale Dolin.
 {¶ 51} Appellant testified at trial she was an officer of Shale's, but was never employed by the pharmacies. Appellant stated, as corporate secretary, she signed papers her husband put in front of her, and she signed some payroll checks after his death. As to her experience in financial matters, appellant testified she received over $230,000 in a divorce settlement from her first husband. Appellant further testified after the divorce she invested $323,000 of her money in the National Trust Bank of Arizona to avoid her ex-husband's creditors after he filed for bankruptcy.
 {¶ 52} Appellant stated she did not become aware of the Shale's check kite until after her husband's death. Appellant further stated she moved over $100,000 into her personal Sammsin account the day after Shale Dolin's death because she feared her assets would be "at risk."
 {¶ 53} In addition to the above testimony, the deposition testimony of Sharon Hawk, Key Bank fraud analyst, was placed in the record. Hawk stated the Shale's case was referred to her by the bank's "return items group." She further stated "suspects" on the list must be confirmed through an analysis of the account; however, she is not familiar with all the criteria for placing an account on the suspect list. Hawk testified Key Bank has a "post all system" which pays checks regardless of how much money is in a particular account. Hawk testified she never saw Shale's appear on a check kite report, and she did not know why the kite was not detected sooner. She was not aware of any changes implemented by the bank since the Shale's check kite was discovered.
 {¶ 54} On September 4, 2003, the trial court, after considering all the evidence, filed a judgment entry in which it found appellant liable for the entire amount of the overdrafts and unpaid loans pursuant to the terms of the unlimited commercial guaranties. As to mitigation of damages, the trial court found appellant failed to present evidence sufficient to show "the failure to detect the kite was because [bank] procedures were not followed." Appellant's counterclaim of gross negligence was dismissed, and the banks' request for attorney fees was denied. Appellant was ordered to pay: 1) $1,872,097.65, plus statutory interest from September 14, 2000 for the combined overdrafts; 2) $50,333.53, plus interest, to Key Bank for its unpaid note; and 3) $136,429.68, plus interest, to MidAm for its unpaid note.
 {¶ 55} On September 11, 2003, appellant filed a Civ.R. 60(A) motion in which she asked the trial court to deduct $1,266,105.55 from the judgment or, alternatively, to grant a new trial. Specifically, appellant asked for credit in the amounts of $454,775.38 collected by Key Bank from Shale's accounts receivable and bankruptcy liquidation; and $811,330.17 received by Key Bank from insurance proceeds. On February 4, 2004, the trial court amended its September 4, 2003, judgment entry to reflect a credit of $204,294 collected from Shale's accounts receivable, and $250,479 in distributions from the bankruptcy trustee. Appellant's request for credit from the insurance proceeds was denied. A notice of appeal was filed on February 6, 2004.
 SUMMARY JUDGMENT {¶ 56} Appellant's first and second assignments of error challenge the trial court's August 28, 2001 judgment entry regarding the parties' opposing motions for summary judgment. We note at the outset that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court. Lorain Natl.Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129; Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Keeping the above standard in mind, we now turn to appellant's first two assignments of error.
 {¶ 57} In her first assignment of error, appellant asserts the trial court erred by finding her liable for the nearly $2 million overdraft created by the check kite. In support, appellant argues her liability under the guaranty is limited to, at most, $135,000; the language of the guaranty is ambiguous because it does not use the term "overdraft"; and she did not intend to accept liability for the banks' losses resulting from check kiting.
 {¶ 58} In interpreting a contract, the intent of the parties "is presumed to reside in the language they chose to employ in the agreement."Kelly v. Medical Life Ins. Co. (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. Courts will not go beyond the plain language of an agreement to effectuate the intent of the parties if the language employed therein is clear and unambiguous. Id., at 132.
 {¶ 59} Guaranties are generally construed by courts in the same manner as contracts. G.F. Business Equip., Inc., v. Liston (1982),7 Ohio App.3d 223, 224. Words used in a guaranty are to be interpreted "`in light of the surrounding circumstances and of the object intended to accomplished.'" Id., quoting Morgan v. Boyer (1883),39 Ohio St. 324. "The clear and unambiguous terms of [a guaranty] * * * will not be extended by construction or implication to cover a period of time not embraced within those terms." Fairview Realty Investors v.Seaair, Inc., 8th Dist. No. 81296, 2002-Ohio-6819, at ¶ 10, citing JulesP. Storm Sons, Inc. v. Blanchet (1920), 120 Ohio St. 13, at paragraph one of the syllabus. However, "if a contract is ambiguous so that it may either extend or limit a guarantor's obligation, such contract should be construed to limit the obligation." Id., citing Yearling Properties,Inc. v. Tedder (1988), 53 Ohio App.3d 52.
 {¶ 60} The guaranty executed by appellant on December 4, 1996 was titled "COMMERCIAL CONTINUING GUARANTY (UNLIMITED)." It stated, in relevant part:
 {¶ 61} "2. GUARANTY. Guarantor hereby unconditionally guarantees the prompt and full payment and performance of Borrower's present and future, joint and/or several, direct and indirect, absolute and contingent, express and implied, indebtedness, liabilities, obligations and covenants (cumulatively `Indebtedness') to [MidAm] when due (whether upon maturity or by demand, acceleration or otherwise). Guarantor's liabilities and obligations under the Guaranty ('Obligations') shall be unlimited andshall include all present and future written agreements between Borrowerand Lender (whether executed for the same or different purposes than theforegoing), evidencing the Indebtedness, together with all interest and all of Lender's expenses and costs, incurred in connection with the Indebtedness, including any amendments, extensions, modifications, renewals, replacements or substitutions thereto." (Emphasis added).
 {¶ 62} In addition, the unlimited guaranty contained the following relevant provision:
 {¶ 63} "6. WAIVER. Guarantor hereby waives notice of the acceptance of this Guaranty; notice of present and future extensions of credit andother financial accommodations by Lender to any Borrower; notice of the obtaining or release of any guaranty, assignment, or other security for any of the Indebtedness; notice of presentment for payment, demand, protest, dishonor, default and nonpayment pertaining to the Indebtedness and this Guaranty and all other notices and demands pertaining to the Indebtedness and this Guaranty; any and all defense to payment as permitted by law."
 {¶ 64} Considering the language of the above guaranty in its plain, ordinary sense, we find the agreement unambiguously encompasses all "indebtedness" of Shale's to MidAm, including present and future extensions of credit. The guaranty is not rendered ambiguous by the absence of the term "overdraft" since, under federal banking law, an overdraft on a checking account is considered an extension of credit. SeeWakeman Oil Co., Inc. v. Citizen Natl. Bank (Sept. 13, 1996), Lucas App. No. H-95-045, n. 2, citing 12 C.F.R. § 32.105.
 {¶ 65} Appellant further argues even if she is liable for overdrafts on the Shale's account, she is not liable under the guaranty for MidAm's losses due to the check kite. However, at least one Ohio court has held a debt resulting from check kiting activities creates what may be described as a "subsequent borrowing" or a "claim hereafter arising" under the terms of an unlimited guaranty. The Central Trust Co. v. Goldbach (Apr. 18, 1979), Hamilton App. No. 780123. Accordingly, a guaranty which encompasses all indebtedness of a corporate borrower, including future extensions of credit, obligates an officer-guarantor to repay overdrafts resulting from a check kite. Id.
 {¶ 66} Appellant attempts to distinguish the facts in this appeal from those in Goldbach, supra, by arguing she was an officer of Shale's in name only, and was not responsible for its day-to-day operations. We disagree, for the following reasons.
 {¶ 67} The record contains the deposition testimony of Jeffrey Canfield, who stated the Dolins and Shale's did not have sufficient collateral to support the $135,000 revolving loan without appellant's guaranty. Canfield further testified appellant was the sole owner of the couples' home, which was listed as collateral for the loan, and she was listed as an officer of Shale's Talmadge Pharmacy, Inc. when financial statements were completed during the refinancing of the revolving loan in 1997. Therefore, even if appellant was not involved in actually running Shale's, she was an integral part of obtaining the necessary capital to operate the business, in addition to having at least some responsibility as a named corporate officer. Accordingly, the distinction appellant attempts to draw between this case and Goldbach, supra, is insignificant.
 {¶ 68} Finally, appellant argues she should not be held liable for the amount of the check kite because she never intended to expose herself to "virtually unlimited liability for dishonest conduct of representatives of Shale's." Appellant argues any intent on her part for the guaranty to be continuous is limited by MidAm's obligation to make only "reasonable extensions of credit." In support of her argument, appellant relies onV.F., Inc. d/b/a Valley Farm Foods v. Hamilton (May 9, 1980), Lucas App. No. L-79-356.
 {¶ 69} In Hamilton, supra, this court was asked to interpret the terms of a guaranty executed in connection with an open credit account relationship between a creditor and debtor. At issue in that case was whether the guaranty was "continuous," i.e., covering debts incurred after its execution, or "restrictive," i.e., covering only debts in existence at the time of its execution. After analyzing the terms of the guaranty we found, under the circumstances in that case, "the guarantors * * * intended to authorize any reasonable extensions of credit for purchases secured upon the faith of their guaranty." Id., citing CambriaIron Co. v. Keynes (1897), 56 Ohio St. 501, 514.
 {¶ 70} In this case, in addition to above-stated obligation to repay all indebtedness, present and future, and the waiver of notice, the guaranty states:
 {¶ 71} "12. INDEPENDENT INVESTIGATION. Guarantor's execution and delivery to Lender of this Guaranty is based solely upon Guarantor's independent investigation of Borrower's financial condition and not upon any written or oral representation of Lender in any manner. Guarantorassumes full responsibility for obtaining any additional informationregarding Borrower's financial condition and Lender shall not be required to furnish Guarantor with any information of any kind regarding Borrower's financial condition.
 {¶ 72} "13. ACCEPTANCE OF RISKS. Guarantor acknowledges the absoluteand continuing nature of this Guaranty and voluntarily accepts the fullrange of risks associated herewith including, but not limited to, the risk that Borrower's financial condition shall deteriorate or, if this Guaranty is unlimited, the risk that the Borrower shall incur additional Indebtedness to Lender in the future." (Emphasis added.).
 {¶ 73} We agree with the trial court that V.F., Inc., supra, is distinguishable on its facts, and does not limit appellant's liability under the MidAm guaranty to only "reasonable extensions of credit." Accordingly, appellant's waiver of notice, her acceptance of responsibility to obtain information regarding Shale's financial condition, and her acceptance of the risks involved, encompass the check kiting overdrafts.
 {¶ 74} Upon consideration of the entire record, we find the trial court did not err by finding appellant liable, under the terms of the guaranty, for all of the Shale's indebtedness, including any overdrafts due to the check kite. Appellant's first assignment of error is not well-taken.
 {¶ 75} In her second assignment of error, appellant asserts the trial court erred by denying her motion for summary judgment based on her contractual defenses. In support, appellant makes six separate arguments, as follows.
 {¶ 76} In her first and fifth arguments, respectively, appellant claims the trial court erred by finding no meeting of the minds took place as to the extent of the guaranties; and the nearly $2 million in overdrafts are not enforceable because they are not "reasonable extensions of credit." Based on our disposition of these same issues in appellant's first assignment of error, these arguments are without merit.
 {¶ 77} In her second argument, appellant asserts the trial court erred by granting summary judgment to MidAm on her defense of lack of consideration. Appellant admits the $135,000 revolving loan was consideration for the guaranty; however, she claims such consideration was inadequate in this case.
 {¶ 78} A contract consists of an offer, an acceptance, and consideration. Bono v. McCutcheon, 159 Ohio App.3d 571, 2005-Ohio-299, at ¶ 9. Accordingly, Ohio courts have held the "absence of consideration to support a contract is sufficient to permit its cancellation." SoftwareClearing House, Inc. v. Intrak, Inc. (1990), 66 Ohio App.3d 163, 175.
 {¶ 79} Consideration consists of either a benefit to the promisor or a detriment to the promisee, which must be "bargained for." Bono, supra, at ¶ 10, citing Carlisle v. TR Excavating, Inc. (1997),123 Ohio App.3d 277, 283-284. The benefit "need only be something regarded by the promisor as beneficial enough to induce his promise." Id. Generally, courts will not inquire into the adequacy of consideration once it is found to exist, except in cases of fraud or unfair treatment.Elyria Anesthesia Svcs. v. Valgento (Apr. 29, 1993), 8th Dist. No. 62378; Ford v. Tandy Transp., Inc. (1993), 86 Ohio App.3d 364, 384.
 {¶ 80} As set forth above, appellant does not dispute the $135,000 revolving loan was consideration for her guaranty. Appellant claims, however, holding her liable for the banks' losses due to the check kite constitutes "unfair treatment."
 {¶ 81} While appellant may be unhappy with the result of signing the guaranty, the record contains no evidence she received unfair treatment
in connection with its execution or enforcement. Accordingly, the trial court did not err by refusing to inquire into the adequacy of consideration given in exchange for the guaranty, and granting summary judgment to MidAm on that issue. Appellant's second argument is without merit.
 {¶ 82} In her third argument, appellant asserts the trial court erred by granting summary judgment to MidAm on appellant's defense of unconscionability. In support, appellant claims she "is not of equal bargaining power with the Banks." Appellant also claims the guaranty was unconscionable because, on its face, it appeared to cover only the $135,000 loan when, in reality, it created "liability in excess of $2 million for the wrongful action of someone [other than appellant]."
 {¶ 83} Unconscionability is the absence of meaningful choice on the part of one party to a contract, coupled with "`contract terms which are unreasonably favorable to the other party.'" Haga v. Martin Homes, Inc.,
(Aug. 4, 2000), 5th Dist. No. 2000AP020018, citing Williams v.Walter-Thomas Furniture Co. (C.A.D.C. 1965), 121 U.S. App. D.C. 315, 350, F.2d 445, 449; Lake Ridge Academy v. Carney (1993), 66 Ohio St.3d 376,383. In determining whether an agreement is unconscionable, two questions must be answered: "(1) are there unfair and unreasonable contract terms, i.e., `substantive unconscionability;' and (2) are there individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, i.e., `procedural unconscionability.' * * * Satisfying one prong of the test and not the other precludes a finding of unconscionability." Coble v. Toyota ofBedford, 8th Dist. No. 83089, 2004-Ohio-238, at ¶ 14 (Citations omitted.).
 {¶ 84} The guaranty document is titled "Commercial Continuing Guaranty (Unlimited)." As the trial court noted, the guaranty clause comprises the second paragraph of the document, is boldly labeled, and is "not hidden in a maze of fine print." In addition, as set forth above, appellant's assertion that no meeting of the minds took place with respect to the guaranty is without merit. As to appellant's assertion of unequal bargaining power, the record demonstrates appellant played an integral role in securing financing for Shale's, which include her self-representation as a corporate officer. In addition, appellant testified she knows how to protect her own assets from potential creditors, and she was accustomed to keeping separate bank accounts in her own name. Such evidence refutes the self-characterization of appellant as a financially unsophisticated "housewife."
 {¶ 85} The record contains no evidence, other than appellant's assertions as set forth above, the MidAm guaranty is either substantively or procedurally unconscionable. It is well-established a mere assertion of inequality of bargaining power is generally insufficient to establish procedural unconscionability. McGuffey v. Lenscrafters, Inc. (2001),141 Ohio App.3d 44. Accordingly, we find the trial court did not err by finding the MidAm guaranty was not unconscionable and granting summary judgment to MidAm on that issue. Appellant's third argument is without merit.
 {¶ 86} In her fourth argument, appellant asserts the trial court erred by denying her motion for summary judgment on the defense of gross negligence. Specifically, appellant claims the banks should be estopped from enforcing the guaranties because they failed to exercise sufficient care in detecting the check kite.
 {¶ 87} In ruling on this issue in the context of appellant's summary judgment motion,[5] the trial court considered the affidavit of appellant's expert witness, Karen Smith, who stated the check kite would have been detected earlier if MidAm had reviewed available reports. Smith concluded the bank's failure to detect the check kite amounted to gross negligence.
 {¶ 88} In opposition to Smith's affidavit, the trial court considered the language of the MidAm guaranty, in which appellant agreed to assume full responsibility for obtaining information as to Shale's financial condition. MidAm cited case law in support of its position it owed no duty to appellant, as a guarantor, to detect the check kite in order to minimize appellant's financial risks.
 {¶ 89} Ultimately, the trial court found genuine issues of fact remained which precluded summary judgment for both parties. Accordingly, the issue of the banks' gross negligence was raised again during the bench trial.
 {¶ 90} As set forth above, during the bench trial, testimony was presented by the banks and appellant as to the issue of gross negligence. After hearing all the testimony, the trial court found the banks' check kiting detection system, which eventually resulted in detection of the Shale's check kite, demonstrated at least "some degree of care." Accordingly, appellant's defense and counterclaim of gross negligence were denied.
 {¶ 91} Upon consideration of the foregoing, we find genuine issues of material fact identified by the trial court regarding appellant's defense of gross negligence were resolved after evidence was presented by both parties at the bench trial. Accordingly, and for the reasons discussed in connection with appellant's eighth assignment of error, we find appellant's fourth argument is moot. See Nageotte v. Cafaro Co., 6th Dist. No. E-040-15, 005-Ohio-2098 ("`[A]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made.'" Id at ¶ 23, quoting Continental Ins. Co. v. Whittington (1994), 71 Ohio St.3d 150.).
 {¶ 92} Appellant asserts in her sixth argument the MidAm guaranty terminated on June 4, 1999. In support, appellant claims the bank should have required her to sign an extension and/or a modification agreement for the extended $135,000 loan if it intended to hold her liable on the guaranty.
 {¶ 93} The trial court's August 28, 2001 judgment entry does not contain a specific finding relating to appellant's sixth argument. In addition, appellant has not directed this court's attention to any general finding of the trial court on the issue, or cited any case law in support thereof. However, the trial court indirectly ruled on this issue by finding the guaranty was unlimited, continuous, and applicable to all of Shale's debts to MidAm, including overdrafts resulting from the check kite. Therefore, in the interest of justice and because our review is de novo, we will consider appellant's argument.
 {¶ 94} The MidAm guaranty contains a termination clause which states:
 {¶ 95} "17. TERMINATION. This Guaranty shall remain in full force and effect until Lender executes and delivers to Guarantor a written release thereof. Notwithstanding the foregoing, Guarantor shall be entitled to terminate any unlimited guaranty of Borrower's future indebtedness to Lender following any anniversary of this Guaranty by providing Lender with sixty (60) or more days' written notice of such termination by hand-delivery or certified mail. * * * Such notice of termination shall not affect or impair any of the agreements and Obligations of the Guarantor under this Agreement with respect to any indebtedness existing prior to the time of actual receipt of such notice by Lender, anyextensions, modifications, amendments, replacements or renewals thereof,
and any interest on any of the foregoing." (Emphasis added.).
 {¶ 96} By executing the above-quoted guaranty clause, appellant voluntarily assumed responsibility for "all indebtedness, liabilities, obligations and covenants" between Shale's and MidAm during the time the guaranty was in force. As we previously determined, the MidAm guaranty was: 1) unlimited and continuous; 2) not unconscionable; and 3) supported by consideration. It is undisputed the guaranty was never expressly terminated by MidAm or appellant pursuant to the methods set forth in the termination clause.
 {¶ 97} On consideration, we find appellant's responsibility under the December 4, 1996 MidAm guaranty did not end when the $135,000 revolving loan was extended in June 1999 without her signature. Accordingly, the trial court did not err by finding the guaranty was unlimited and continuous, and appellant's sixth argument is completely without merit.
 {¶ 98} On consideration whereof, this court finds no other genuine issues of fact remain and, after considering the evidence presented in the light most favorable to the non-moving parties, appellees are entitled to summary judgment as a matter of law as to appellant's liability for the check kite, and appellant's defenses of no meeting of the minds, unreasonable extension of credit, lack of consideration, unconscionability and termination of the guaranty. We further find neither party was entitled to summary judgment as a matter of law as to the issue of the banks' gross negligence. Appellant's second assignment of error is not well-taken.
 BENCH TRIAL ISSUES {¶ 99} In her third assignment of error, appellant asserts the trial court erred by finding the banks did not breach a duty to mitigate damages due to the check kite. In support, appellant argues "[t]he evidence presented at the trial overwhelmingly demonstrated that the Banks failed to mitigate their damages."
 {¶ 100} The failure to mitigate damages is an affirmative defense.Young v. Franks Nursery Crafts, Inc. (1991), 58 Ohio St.3d 242, 244. Consequently, at trial, the burden of proving the banks failed to mitigate damages was placed on appellant. Id.
 {¶ 101} It is well-settled "a party who makes a claim on a contract cannot receive damages that it could have prevented by `reasonable affirmative action.'" Four Seasons Environmental, Inc. v. Westfield Cos.
(1994), 93 Ohio App.3d 157, 159, citing F. Enterprises v. KentuckyFried Chicken Corp. (1976), 47 Ohio St.2d 154, at paragraph three of the syllabus. Accordingly, the issue presented on appeal is whether the banks are limited to recovering only those damages arising from the check kite which could not, by reasonable effort, have been avoided or reduced without undue risk or expense. See F. Enterprises, supra. The trial court's determination as to whether appellant met this burden will not be overturned if it is support by competent, credible evidence. C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 280.
 {¶ 102} At trial, Dennis D'Ambrosio testified Key Bank had a check kite reporting procedure in place; however, the system produced too many "false positives." D'Ambrosio further testified the bank employed two full time employees and one part time employee to review reports of approximately 20,000 accounts per month. D'Ambrosio testified, after reviewing reports generated after the Shale's kite was detected, someone looking at Shale's account would have seen a pattern of large deposits, along with checks written on the same account in similar amounts.
 {¶ 103} As set forth above, Karen Smith testified the banks should have acted sooner to detect and stop the check kite. However, on cross-examination, Smith could not say how much money would have been saved by earlier action on the part of the bank. Julie Meiers stated a loan officer would know his or her customer's net worth. She further stated the banks' policies, as written, were "adequate." As set forth above, Richard Haug testified the banks' procedures were adequate and, in his opinion, check kiting is not a "major exposure of risk" in the banking industry.
 {¶ 104} It was undisputed at trial the deposit and checking activity in Shale's account rose steadily and somewhat dramatically over the 18 months preceeding September 2000. Ultimately, activity in the Shale's accounts grew to an aggregate of $1 million per day. However, as set forth above, even appellant's expert witnesses testified the banks' policies and procedures were standard in the banking industry. Only Smith, who has no experience as a banker, testified the Shale's check kite should have been detected before September 2000.
 {¶ 105} In addition, appellant asserts Jerry Cranney, a Key Bank Senior Vice President, testified in a deposition Key Bank had "ample opportunity to identify and react" to the Shale's check kite. However, Cranney's comments, made in a memorandum summarizing the circumstances of the check kite, actually stated Key Bank had such an opportunity between August 1, 2000 and September 15, 2000, only one month before the kite was discovered.
 {¶ 106} This court has reviewed the entire record and, on consideration, finds insufficient evidence to demonstrate the banks' losses were caused by a failure to take reasonable affirmative action. Accordingly, the trial court's determination is upheld and appellant's third assignment of error is not well-taken.
 {¶ 107} In her fourth assignment of error, appellant asserts the trial court erred by finding no novation occurred on the Key Bank guaranty appellant signed on August 21, 1996. In support, appellant argues her liability under the 1996 Key Bank guaranty was extinguished because she was not required to sign a new guaranty when Shale Dolin refinanced the revolving loan on January 24, 1999.
 {¶ 108} The Ohio Supreme Court has held, in order for a non-signing co-makers' liability on a promissory note to be discharged by novation, "`there must be * * * a mutual agreement between the creditor and his debtor which is intended to extinguish the old obligation by substituting a new one therefor. Thus * * * for an obligation * * * to have the effect of discharging the liability on the prior note, the new note must be given with that understanding on the part of both * * *.'" Federal LandBank of Louisville v. Taggart (1987), 31 Ohio St.3d 8, 13-14, citing Annotation, Renewal Note Signed by One Comaker as Discharge of Nonsigning Comakers (1972), 43 A.L.R.3d 246, 252-253. However, evidence of the understanding required for a novation must be "clear and definite, since a novation is never presumed." Boloing v. ClevePak Corp. (1984),20 Ohio App.3d 113, 125.
 {¶ 109} Appellant argues Key Bank released her from liability on the unlimited guaranty by refinancing the 1996 promissory note without requiring her to sign a new unlimited guaranty. In support, appellant refers to the trial testimony of Gwen Micham, who stated the proceeds of the 1999 Key Bank note were used to pay off the 1996 note, and Rehman Scholz, who stated he became aware during the check kite investigation appellant was not asked to sign a new guaranty in 1999.
 {¶ 110} Ohio courts have consistently held "a continuing, unlimited guaranty is a separate and distinct agreement from loan agreements."Fifth Third Bank v. Jarrell, 10th Dist. No. 04AP-358, 2005-Ohio-1260, at ¶ 16; National City Bank v. Concorde Controls, Inc. v. Brousil, 11th Dist. No. 2001-L-113, 2002-Ohio-6578, at ¶ 20, citing Huntington Nat.Bank v. Martin (Mar. 12, 1999), 11th Dist. No. 98-L-082. The unlimited Key Bank guaranty appellant signed in 1996 stated, in relevant part:
 {¶ 111} "2. GUARANTY. Guarantor hereby unconditionally guarantees the prompt and full payment and performance of Borrower's present and future,
joint or several, direct and indirect, absolute and contingent, express and implied, indebtedness, liabilities, obligations and covenants (cumulatively "Indebtedness") to Lender when due (whether upon maturity or by demand, acceleration or otherwise). Guarantor's liabilities and obligations under the Guaranty ("Obligations") shall be unlimited andshall include all present and future written agreements between Borrowerand Lender (whether executed for the same or different purposes than theforegoing), evidencing the Indebtedness, together with all interest and all of Lender's expenses and costs, incurred in connection with the Indebtedness, including any amendments, extensions, modifications,renewals, replacements or substitutions thereto.
 {¶ 112} "* * *
 {¶ 113} "6. WAIVER. Guarantor hereby waives notice of the acceptance of this Guaranty; notice of present and future extensions of credit and other financial accommodations by Lender to any Borrower; notice of the obtaining or release of any guaranty, assignment, or other security for any of the indebtedness;
 {¶ 114} "* * *
 {¶ 115} "13. ACCEPTANCE OF RISKS. Guarantor acknowledges the absoluteand continuing nature of this Guaranty and voluntarily accepts the fullrange of risks associated herewith including, but not limited to, the risk that Borrower's financial position shall deteriorate or, if thisGuaranty is unlimited, the risk that Borrowed shall incur additionalindebtedness to Lender in the future.
 {¶ 116} "* * *
 {¶ 117} "17. TERMINATION. This Guaranty shall remain in full force and effect until Lender executes and delivers to Guarantor a written release thereof. Notwithstanding the foregoing, Guarantor shall be entitled to terminate any unlimited guaranty of Borrower's future Indebtedness to Lender following any anniversary of this Guaranty by providing Lender with sixty (60) or more days' written notice of such termination by hand delivery or certified mail * * *." (Emphasis added.).
 {¶ 118} Pursuant to the terms of the 1996 Key Bank guaranty set forth above, appellant agreed in advance to accept the risk for all present and future indebtedness of Shale's and, in addition, waived all notice of any future extensions of credit. It is undisputed appellant never attempted to terminate the guaranty according to its terms. This court has held, under such circumstances, a guarantor "can preclude his [or her] own discharge" from liability. V.F., Inc., dba Valley Farm Foods v.Hamilton, supra.
 {¶ 119} Upon consideration of the foregoing, we find appellant was not discharged from liability under the 1996 guaranty when Shale Dolin refinanced the 1996 Key Bank note in 1999. Appellant's fourth assignment of error is not well-taken.
 {¶ 120} In her fifth assignment of error, appellant asserts the trial court erred by striking her jury trial demand. In support, appellant argues Civ.R. 39(A) provides the sole method by which litigating parties may waive the right to a jury trial.
 {¶ 121} Pursuant to Civ.R. 38(D), failure to make a timely jury demand constitutes a waiver of the right to a jury trial. Pursuant to Civ.R. 39 (A), once an action has commenced and a proper jury demand has been made, the action will be tried to a jury unless:
 {¶ 122} "(1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist." A party's failure to appear for trial may also constitute a waiver of trial by jury. Id.
 {¶ 123} It is well-established a party may waive his or her right to a jury trial by processes other than those provided by the Civil Rules. SeeCassidy v. Glossip (1967), 12 Ohio St.2d 17 (Failure to make a jury demand according to local court rules constituted a waiver of the right to a jury trial. Id. at 23, interpreting former R.C. 2315.20.). See also, Shimko v. Lobe (2004), 103 Ohio St.3d 59 (The right to a jury trial, where it exists, may be waived. Id. at ¶ 29.). Accordingly, Ohio courts have held contractual jury-waivers, in which the parties agree not to ask for a jury trial, are enforceable where the terms of the waiver are clear and unambiguous. Truck World, Inc. v. Fifth Third Bank (Sept. 29, 1995), 1st Dist. Nos. C-940029 and C-940399.
 {¶ 124} In this case, the MidAm unlimited guaranty contained the following provision:
 {¶ 125} "7. Waiver of jury trial. lender and guarantor knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on, or arising out of, under or in conjunction with the indebtedness guaranteed hereby, this guaranty and any other agreement contemplated to be executed in conunction herewith, or any course of conduct, course of dealing, statements (whether oral or written) or actions of either party. this provision is a material inducement for lender making the loan or loans guaranteed hereby."
 {¶ 126} The above jury-waiver provision was conspicuously set forth in the unlimited guaranty, and its language is all-encompassing and unambiguous. The record contains no evidence the jury-waiver was unknowingly or involuntarily made.
 {¶ 127} This court has reviewed the trial court's record and, upon consideration, finds the jury-waiver provision in the unlimited guaranty is enforceable.[6] Accordingly, the trial court did not err by striking appellant's jury demand, and appellant's fifth assignment of error is not well-taken.
 {¶ 128} In her eighth assignment of error, appellant asserts the trial court erred by dismissing her counterclaim of gross negligence against the banks. Appellant argues the evidence "overwhelmingly supports" a finding the banks failed to mitigate their damages and exercised no care in preventing the check kite. Accordingly, in addition to asserting gross negligence as a defense, appellant asserts the banks' gross negligence entitles her to recover attorney fees.[7]
 {¶ 129} Generally, parties are responsible for their own attorney fees incurred as a result of litigation, but the recovery of attorney fees is not precluded in all circumstances. SD Mechanical Contrs., Inc. v.Enting Water Conditioning Sys., Inc. (1991), 71 Ohio App.3d 228, 241. Legal fees may be recovered if the trier of fact determines that the fees are the legal consequences of the original wrongful act. Homes byCalkins, Inc. v. Fisher (1993), 92 Ohio App.3d 262, 273. See, also,Brookeside Ambulance v. Walter Ambulance Svc. (1996),112 Ohio App.3d 150. Accordingly, appellant may be entitled to an award of attorney fees if the banks were grossly negligent.
 {¶ 130} Gross negligence has been defined as "the `failure to exercise any or very slight care.'" Thompson Electric, Inc. v. Bank One, Akron,N.A. (1988), 37 Ohio St.3d 259, 265, quoting Johnson v. State (1902),66 Ohio St. 59, 67. It is also said to be "`a failure to exercise even that care which a careless person would use.'" Id., quoting Prosser 
Keeton, Law of Torts (5 Ed. 1984) 212, Section 34.
 {¶ 131} As set forth above, the trial court found the issue of whether appellant met her burden of demonstrating gross negligence was an issue of fact to be resolved at trial. Accordingly, the trial court's judgment will not be overturned on appeal if it is support by competent, credible evidence. C.E. Morris Co. v. Foley Constr. Co., supra.
 {¶ 132} It is undisputed the banks had policies and procedures in place for detecting a check kite. Those policies and procedures eventually exposed the Shale's check kite. Although Smith expressed her opinion the kite should have been caught sooner, she admitted the banks' fraud detection methods were "adequate." Other testimony was presented regarding the nature of the Shale's check kite, with Williams stating the MidAm kite was more difficult to detect because of the account's "sweep" feature. Testimony was presented by Meiers that kite reports are generated at the branch where an account is opened, not necessarily where banking activity occurs. Haug testified the banks' procedures were consistent with commercial banking practices, and check kiting is not a major source of risk for banks.
 {¶ 133} This court has considered the entire record and, upon consideration thereof and our determination as to appellant's third assignment of error, finds sufficient competent, credible evidence to support the trial court's finding the banks exercised "some degree of care." Accordingly, the trial court was correct in finding the banks were not grossly negligent and dismissing appellant's estoppel defense and request for attorney fees. Appellant's eighth assignment of error is not well-taken.
 POST-TRIAL ISSUES {¶ 134} In her Civ.R. 60(A) motion for correction of the trial court's September 4, 2000 judgment, appellant asked the trial court to deduct a total of $1,266,105.55 from the amount she was ordered to pay the banks. As set forth above, on February 4, 2004, the trial court credited appellant for a total of $454,774.45 in proceeds from the Shale's bankruptcy and liquidation of its accounts receivable, but summarily denied her request for credit of the $811,330.10 in insurance proceeds paid to Key Bank after the check kite was discovered.
 {¶ 135} In her sixth assignment of error, appellant asserts the trial court erred by not crediting her with the $811,330.10 in insurance proceeds. In support, appellant argues the insurance company is not entitled to subrogation in this case, because: 1) it is undisputed appellant was not the actual "wrongdoer"; and 2) as a matter of law, an insurance company's right of subrogation does not arise until its insured is "made whole."
 {¶ 136} Generally, the right to subrogation is "premised on the contractual obligations of the parties, either express or implied." BlueCross Blue Shield Mut. of Ohio v. Hrenko (1995), 72 Ohio St.3d 120, 121. Where it exists, it extends "not only to the rights of the creditor against the principal, but to the rights of the creditor against persons other than the principal * * * [who are] liable to the creditor for the same default." Maryland Casualty Co. v. Gough (1946), 146 Ohio St. 305,318.
 {¶ 137} In support of her first argument, appellant states the term "subrogation" has been defined as the right of an insurer to acquire the rights of its insured as against "the wrongdoer." See Bogan v.Progressive Cas. Ins. Co. (1988), 36 Ohio St.3d 22, 29. However, the ultimate purpose of subrogation is to provide for a substitution of the insurer for the creditor "in relation to the obligation of the debtor, to the end that the burden of obligation be ultimately placed upon those towhom it primarily belongs * * *." Maryland Casualty Co. v. Gough (1946),146 Ohio St. 305, 315 (Emphasis added.).
 {¶ 138} The record contains a portion of the Key Bank Insurance Co., Ltd., the reinsurer for KeyCorp Financial Institutions Bond, No. 8145-87-15 policy, which was attached to the banks' motion in opposition to appellant's motion to correct the judgment entry/motion for a new trial. The policy states, in relevant part:
 {¶ 139} "Section 7. ASSIGNMENT-SUBROGATION-RECOVERY-COOPERATION
 {¶ 140} "* * *
 {¶ 141} "(b) In the event of payment under this bond, the Underwriter shall be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment. * * *"
 {¶ 142} As set forth above, by executing the MidAm guaranty, appellant "unconditionally" guaranteed payment of Shale's debts, and stated the promise to pay is "unlimited." Generally, where such language is used in a guaranty, the guarantor is primarily liable upon default of the principal. Stone v. Natl. City Bank (1995), 106 Ohio App.3d 212, 218, quoting Finance v. Politzer (1968), 16 Ohio App.2d 83, 89, reversed on other grounds, 21 Ohio St.2d 177.
 {¶ 143} In addition to the above, in our determination as to appellant's first assignment of error, we found appellant is liable under terms of the guaranty for all of Shale's indebtedness to the banks, including any overdrafts created by the check kite. Accordingly, in this case, appellant is the person upon whom the obligation primarily belongs. It is irrelevant that she was not the actual "wrongdoer."
 {¶ 144} Appellant further argues, pursuant to the "made whole" doctrine, the insurance company may not recover the $811,330.10 payment through subrogation until Key Bank has been fully compensated for its loss, and no right of subrogation exists because the payment to Key Bank was made pursuant to a "bond" and not because of a "routine bank loss."
 {¶ 145} As a preliminary note, the record contains only that portion of the insurance policy between Key Bank and Key Bank Insurance Co., Ltd. However, we previously found appellant's liability as guarantor is primary. Accordingly, we need not address appellant's assertion as to the nature of the "bond," or the insurance company's corresponding obligation to compensate Key Bank for any particular type of loss.
 {¶ 146} As to the "made whole" doctrine, in Huron County Bd. ofCommrs. v. Saunders, 149 Ohio App.3d 67, this court stated that "an insurer's subrogation interest will not be given priority where doing so will result in less than full recovery to the insured." Id., 2002-Ohio-3974, ¶ 30; Hrenko, supra, at the syllabus.
 {¶ 147} Appellant's argument she is entitled to a $811,330.10 credit based on Saunders is misplaced. The rule set forth in Saunders, supra, and Hrenko, supra, was intended to insure that parties, injured in automobile accidents, were fully compensated by the tortfeasor before funds expended by insurance carriers were reimbursed. In contrast, in this case, appellant is asking for a "credit" for insurance proceeds paid to Key Bank pursuant to a loss guaranteed by appellant. Instead of fulfilling the purpose of the "made whole" doctrine, appellant's interpretation prevents the banks from ever having a full financial recovery which, in turn, prevents reimbursement to the insurance carrier.
 {¶ 148} On consideration of the entire record, we find the trial court did not err by denying appellant's request for a credit of $811,300.10 for insurance proceeds paid to Key Bank. Appellant's sixth assignment of error is not well-taken.
 {¶ 149} In her seventh assignment of error, appellant asserts the trial court erred by awarding interest on the judgment accruing after November 9, 2000, the date Shale's filed for bankruptcy. In support, appellant cites 11 U.S.C. § 502(b)(2), which disallows claims for "unmatured interest" against a debtor after a bankruptcy petition is filed. Alternatively, appellant argues the trial court erred by awarding the banks interest on the $454,775.38.
 {¶ 150} As to appellant's first argument, 11 U.S.C. § 502(b)(2) provides, if an objection to a claim in bankruptcy is made, the court shall determine the amount of such claim, except to the extent it is for unmatured interest. However, 11 U.S.C. § 524(e) provides the discharge of a debt in bankruptcy "does not affect the liability of any other entity on, or the property of any other entity for, such debt."
 {¶ 151} Appellant relies on Hart Ski Mfg. Co, Inc. v. Aetna BusinessCredit, Inc., (Bankr.Ct.Minn. 1980), 7 B.R. 465, in support of her argument that the trial court was prohibited from assessing interest on the debt owed by Shale's pursuant to 11 U.S.C. 502(b)(2). In Hart, the federal bankruptcy court for the District of Minnesota held that claims for unmatured interest, i.e., interest accruing after the filing of the debtor's bankruptcy petition, is disallowed pursuant to11 U.S.C. § 502(b)(2) against the guarantor of a letter of credit issued for a bankrupt debtor.
 {¶ 152} In contrast, in In re El Paso Refining, Inc.,
(Bankr.Ct.W.D.Tex. 1996), 192 B.R. 144, the federal bankruptcy court for the Western District of Texas held, as to the liability of a guarantor whose liability is primary, "section 502(b)(2) does not toll the accrual of unmatured interest." Id. at 146. The bankruptcy court further stated, pursuant to 11 U.S.C. § 524(e), the discharge of a debtor in bankruptcy "`does not affect co-debtors or guarantors.' S.REPT. NO. 95-989 to accompany S. 2266, 95th Cong., 2d Sess. 80-81 (1978), U.S. CODE 
ADMIN. NEWS p. 5787, 5867." Id.
 {¶ 153} The El Paso court distinguished Hart, supra, based on the language of the guaranty at issue which, similar to the guaranties in this case, created primary liability, expressly including "interest" in the definition of the guarantors' obligations. Other federal and Ohio courts have followed the reasoning in El Paso. See, also, MetroCommercial Real Estate, Inc. v. Reale (E.D. Pa. 1997), 968 F. Supp. 1005
(Pursuant to 11 U.S.C. § 524(e), "A bankruptcy discharge * * * does not affect the liability of any other entity liable on the debtor's debt, but rather only bars a creditor from pursuing the discharged debtor for that debt." Id. at 1007.); In re Estate of Roberta G. Honaker (Morgan),Deceased, (Jan. 12, 2001), 6th Dist. No. L-00-1186 (Pursuant to11 U.S.C. 524(e), discharge of a debtor in bankruptcy extinguishes only "the personal liability of the debtor.")
 {¶ 154} On consideration, we find the reasoning expressed in El Paso,
supra, and the cases cited thereafter to be applicable in this case. Accordingly, the trial court did not err by including interest accruing after November 9, 2000, in the judgment awarded to the banks.
 {¶ 155} As to appellant's claim the trial court erred by awarding interest on the $454,775.38 collected by the banks, in its judgment entry issued on February 4, 2000, the trial court stated, in pertinent part:
 {¶ 156} "It is further ORDERED that the judgment against Sue Anne Dolin be credited for $205,295.00 collected from Shale's accounts receivable plus interest from the date of collection.
 {¶ 157} "It is further ORDERED that judgment against Sue Anne Dolin be credited for distributions paid from the bankruptcy trustee in the amount of $138,966.00 and $111,513.00, plus interest from the date eachdistribution was paid." (Emphasis added.).
 {¶ 158} A review of the record shows appellant's argument as to interest assessed on the $454,775.13 is moot.
 {¶ 159} On consideration, we find the trial court did not err in its assessment of interest on the debt owed to the banks. Appellant's seventh assignment of error is not well-taken.
 {¶ 160} The judgments of the Lucas County Court of Common Pleas are hereby affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Lucas County and for which execution is awarded. See App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Singer, P.J., Skow, J., Parish, J. Concur.
[1] Sue Anne Dolin was named as a defendant in her individual capacity and, later, as the executor of her late husband's estate. However, because Sue Anne Dolin is, in fact, one person, she will be referred to as "appellant" throughout this opinion.
[2] The promissory note contained a "cognovit provision" authorizing judgment against appellant upon default. The same day the complaint was filed, the trial court ordered appellant to pay MidAm $1,159,964.85; however, the cognovit judgment was later vacated, in response to appellant's motion for relief from judgment pursuant to Civ.R. 60(B).
[3] Appellant's answer initially included additional defenses based on the Equal Credit Opportunity Act, fraudulent inducement, bad faith, and impairment of collateral; however, those defenses were later abandoned.
[4] Appellant later abandoned her counterclaim for judgment in the amount of the check kite. On April 19, 2001, Key Bank filed answers to both complaints, and asked the trial court to dismiss the counterclaim.
[5] The parties submitted cross-motions for summary judgment on the issue of gross negligence; however, appellees have not filed a cross-appeal.
[6] As set forth above, the trial court's decision as to the jury-waiver provision applies equally to the MidAm guaranty and the Key Bank guaranty.
[7] The trial court actually denied appellant's claim for attorney fees because the record contained no evidence "of what the total indebtedness was at the time of entering into the contract * * *." However, appellant has not challenged the trial court's reasoning in that regard on appeal.